**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| David Wayne Kiehle, | ) CIV 11-352-PHX-GMS (MHB) |
| Petitioner, | ) **REPORT AND RECOMMENDATION** |
| vs. | ) |
| Charles L. Ryan, et al., | ) |
| Respondents. | ) |

TO THE HONORABLE G. MURRAY SNOW, UNITED STATES DISTRICT JUDGE:

Petitioner David Wayne Kiehle, who is confined in the Arizona State Prison Complex-Florence, filed a *pro se* Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254. On March 2, 2011, the Court dismissed the Petition with leave to amend. On March 10, 2011, Petitioner filed an Amended Petition, which the Court also dismissed with leave to amend. On April 4, 2011, Petitioner filed a second Amended Petition (Doc. 7). Respondents, thereafter, filed an Answer, but despite having been given the opportunity to file a reply, Petitioner failed to do so.

## BACKGROUND[1]

On April 8, 1999, the Maricopa County Grand Jurors indicted Petitioner for the premeditated first degree murder of his wife, Natalie. (Exh. A.) A jury found him guilty as charged on May 2, 2000, and the trial court sentenced him to natural life imprisonment. (Exh. B; Exh. C at 4-5.) The trial court subsequently granted Petitioner's petition for post-

---

[1] Unless otherwise noted, the following facts are derived from the Exhibits submitted with Doc. 15 – Respondents' Answer.

conviction relief, and ordered a new trial. (Exh. EE at 10, ¶27.) In 2005, a jury found Petitioner guilty of second degree murder, a lesser included offense of first degree murder, and the trial court imposed an aggravated term of 22 years' imprisonment. (Exhs. F, G.)

The Arizona Court of Appeals summarized the facts underlying Petitioner's conviction and sentence as follows[2]:

*The Investigation*

At approximately 4:45 a.m. on July 6, 1998, Kiehle called 9-1-1 to request an ambulance because he had found his wife, Natalie, shot in the head in their bedroom. When Kiehle then abruptly hung up the telephone, the operator called him to request more information, specifically where Kiehle was in the home and where the gun was located. Kiehle responded that he had been asleep when the shooting occurred, that he was currently in the bedroom with Natalie and that the gun was there.

When Chandler Police officers arrived at the scene approximately three minutes later, they saw [Kiehle and Natalie's] 12-year-old [child] B. outside the home, visibly upset and yelling "[h]e didn't kill her!" Officer Steven Nichols stayed outside with B. while Officers Joseph McAuliffe and Tom Nemeth entered the home. They noticed a sleeping bag, blankets and pillows on the living-room floor, and, upon hearing a noise from a hallway, they proceeded to the master bedroom where they saw Kiehle holding Natalie on the bed. Natalie "appeared lifeless," and Kiehle was "crying slightly." There was no blood on him.

McAuliffe asked Kiehle to move from Natalie so that paramedics could attend to her. McAuliffe then entered the bedroom and noticed a gun case and a .44 caliber double-action revolver lying on the floor next to the bed near Natalie. Checking for signs of life, McAuliffe noticed that Natalie had no pulse, that her chest was not moving and that "[s]he was cold to the touch." Paramedics confirmed that Natalie was dead.

Upon McAuliffe's question of what had happened, Kiehle said that he and B. had been watching movies in the living room when Natalie had gone to bed near midnight. At some point, he continued, B. had fallen asleep, and he had gone to the bedroom, whereupon he and Natalie had engaged in sex. Kiehle said that he had been going to the kitchen to get a glass of water when he had heard a gunshot, returned to the bedroom and found Natalie on the bed and the gun on the floor. During this conversation with McAuliffe, Kiehle appeared to be calm, had stopped crying and was speaking in a normal conversational tone.

Detective James Petersen arrived on the scene at approximately 5:45 a.m. Upon examining Natalie's body, he noticed the absence of an exit wound at

---

[2] This Court presumes that the court of appeals accurately recited the facts. See 28 U.S.C. §§ 2254(d)(2), (e)(1); Purkett v. Elem, 514 U.S. 765, 769 (1995) (per curiam); Williams v. Rhoades, 354 F.3d 1101, 1106 (9th Cir. 2004).

the back of her head and that she had a gunshot wound to the nose. He also noticed gunpowder residue on the right side of her face and blood all over her body and the bed. The revolver had been loaded with six rounds, one of which had been fired.

Ann Olney, a crime scene investigator for the Chandler Police Department, arrived at the scene at 6:30 a.m. and assisted Petersen with the investigation. Olney noticed lividity discoloration in Natalie's feet, thighs and arms. Natalie's torso and arms appeared stiff.

As Olney was collecting the evidence, Kiehle entered the bedroom, and, when detectives proceeded to cover Natalie's body, said, "[t]here's no need to cover her." To Olney, Kiehle appeared "very stoic" and clean, as if he had just showered; he was neither crying nor apparently sad. Her opinion was that Kiehle's behavior was unusual for someone whose spouse had just shot herself.

As the investigation continued, at Kiehle's request, a Catholic priest arrived to administer last rites to Natalie although she was not Catholic. Natalie's body remained uncovered during the service attended by Kiehle and B. Thereafter, a representative of the Maricopa County Medical Examiner's office took Natalie's body.

In a conversation with Petersen, Kiehle explained that he and Natalie had been together thirteen years. He was a Marine stationed at Camp Pendleton in California, and he would come home every other weekend. Natalie had filed for divorce on May 22, 1998, however, and Kiehle had accepted service of the papers at Natalie's lawyer's office six days later. Petersen offered Kiehle information about victim assistance, which Kiehle declined, and he also gave him the telephone number of a company that cleans crime scenes, to which Kiehle responded that he would clean the scene himself.

Early in the afternoon of July 6, Petersen returned to the scene with Sgt. Kenneth Thatcher to collect the bullet that had killed Natalie. Kiehle was cooperative, and Petersen and Thatcher recovered bullet fragments in the floor under the bed.

The Chandler Police Department retained Lucien Haag, a private criminalist. Based on Haag's request for further evidence, Thatcher and Detective Phil Beese returned to the Kiehle house on September 1. Kiehle was still cooperative. Thatcher and Beese noticed that the bedroom furniture had been rearranged, and, because the bed had been made and Kiehle's clothing was in the room, it appeared that Kiehle was using the room as a bedroom. Thatcher and Besse proceeded to take measurements of the bullet's path through the mattress to determine the bullet's trajectory angle, but they also saw that there was still a bloodstain on the mattress.

Thatcher asked Kiehle if he had any ammunition of the type that was in the gun at the time of Natalie's death. Kiehle responded that he did not, adding that the bullets were reloaded ammunition that he had purchased from a Phoenix store that was no longer in business.

Haag, Thatcher, Besse and Dr. Mark Fischione, the Maricopa County Medical Examiner, conducted some preliminary informal staging of the shooting incident and concluded that the original bed would facilitate the testing.

- 3 -

Accordingly, Thatcher and Besse returned to Kiehle's residence on December 24. By this time, Haag had examined the bullet fragments and determined that the bullet was not a reload but, rather, a factory ammunition Union Metallic Cartridge. Kiehle was initially cooperative and helpful, and, when Thatcher asked him if he had any Union Metallic Cartridge bullets, Kiehle responded that he did not. When Kiehle then expressed frustration at the prolonged duration of the investigation, Thatcher said, "statements aren't always honest, but the evidence doesn't lie." Kiehle appeared "startled," and, from that point on, he no longer cooperated with the investigation.

The Chandler Police Department conducted three reconstructions of the shooting during January, February and March 1999. Haag participated in the latter two reconstructions, and he conducted approximately twenty tests and considered numerous possible scenarios of Natalie having shot herself. Haag later testified that, based on the gunpowder and soot patterns on Natalie's face, the stippling on her right forearm, the trajectory of the bullet and the pattern of vaporized lead residue on Natalie's shirt, Natalie's injury was not self-inflicted.

Thatcher obtained a search warrant for Kiehle's home. On March 30, 1999, officers arrested Kiehle, and, upon executing the warrant, Thatcher found in a closet a box of Union Metallic Cartridge .44 caliber ammunition with six bullets missing.

*The Autopsy*

Dr. Fischione conducted an autopsy on Natalie's body at 11:45 a.m. on the day she was shot. He observed full rigor mortis and fixed lividity in her larger muscles. Based on his initial external examination, he noticed fresh bruising under Natalie's chin, on her neck, on the lateral side of her right chest and on her right arm. When conducting the internal examination, he found hemoaspiration (blood-filled lungs) and blood in Natalie's stomach. He eventually deemed the manner of death to be homicide and the cause of death to be complications of a gunshot wound to the head.

Dr. Fischione later testified that Natalie had choked and suffocated on her own blood, that she had died several minutes after having been shot and that she could have been conscious during that time. He also testified that the bruising could have been caused by someone holding Natalie down after she had been shot. He stated that a body does not noticeably cool until 1.5 to two hours after death and that rigor mortis is not prevalent until six to twelve hours after death.

*Kiehle and Natalie's Relationship*

Natalie and Kiehle married in 1985 when she was eighteen years old. A few days before the wedding, Natalie's mother, Marlys McFarland, had mentioned her divorce to Kiehle. When she then had asked Kiehle what would happen if he and Natalie were to divorce, he replied, "to divorce a Kiehle is to die."

In 1997, Natalie and B. ended sixteen months' living with McFarland and her husband in Phoenix and moved into a house in Chandler. Kiehle was stationed at Camp Pendleton, and he would return to Chandler occasionally on weekends. In Chandler, he would rearrange the house and replace the items that Natalie had set out for decoration with items that he wanted to display.

During the six-month period before Natalie's death, McFarland noticed that Natalie was unhappy and stressed when Kiehle returned to Chandler. Aside from those times with Kiehle, though, Natalie was otherwise happy. McFarland noticed also that Natalie seemed relieved after Natalie had filed for divorce, a step that Natalie had wanted to take for years.

In October 1997, Natalie began a romantic relationship with Barton Lucas. Lucas and Natalie talked about her marriage, and Lucas knew that she had initiated divorce proceedings.

Natalie filed for divorce on May 22, 1998, and sought sole custody of B. Six days later, she brought Kiehle to her lawyer's office to accept service of the papers. Kiehle was dressed entirely in black and exhibited hostility towards the lawyer, John Giles, trying to stare him down. After signing the papers, Kiehle tossed the pen at Giles and left the office.

Giles later testified that, of the many times he had served divorce papers on a spouse in his office, he had never witnessed such hostility. He said that, based on the incident in his office, he had been concerned for Natalie's safety and had asked her whether she felt that she was in any danger. Natalie's response is unknown, but she left the office to join Kiehle in their car. Kiehle never responded to the petition for divorce and never indicated to Giles that he was going to contest the divorce or Natalie's request for custody.

Natalie spent the July 4 weekend with Lucas; B. stayed with Kiehle. Lucas and Natalie had sex on July 5, and Lucas did not notice any bruising on Natalie. When Natalie received a call from B. later that day, however, she returned home.

(Exh. EE at 2-10, ¶¶ 2-25 (footnotes omitted).)

In August 2005, based on the foregoing facts and evidence, a jury found Petitioner not guilty of first degree murder and guilty of the lesser-included offense of second degree murder. (Exh. Y at 3-5.) Following an aggravation hearing, the jury found two aggravating factors proved beyond a reasonable doubt, and the trial court sentenced Petitioner to an aggravated term of 22 years' imprisonment. (Exh. AA at 6, 41.)

On July 10, 2006, Petitioner, through counsel, filed an opening brief in the Arizona Court of Appeals, raising six issues:

(1) Kiehle was denied his rights under the Fifth, Sixth and Fourteenth Amendments to the United States Constitution when he was "compelled" to wear a leg restraint during trial;

(2) Kiehle was denied his rights under the Fifth, Sixth, and Fourteenth Amendments when the trial court refused to permit him to introduce statements Natalie made to her divorce attorney;

(3) Kiehle was denied his rights under the Fifth and Fourteenth Amendments when the prosecutor commented on his refusal to cooperate with the police investigation;

- 5 -

(4) The trial court abused its discretion by refusing to ask several jury questions inquiring into the presence of medical evidence corroborating Kiehle's claim that he had engaged in sexual intercourse with Natalie shortly before her murder;

(5) The trial court's jury instruction defining reasonable doubt lowered the State's burden of proof and violated Kiehle's rights under the Fifth, Sixth, and Fourteenth Amendments; and

(6) The prosecutor engaged in misconduct by "attack[ing] defense counsel's integrity in closing arguments."

(Exh. BB.) The State filed an answering brief (Exh. CC), and Petitioner filed a reply (Exh. DD). In a memorandum decision issued on June 28, 2007, the Arizona Court of Appeals denied Petitioner's claims and affirmed his conviction and sentence. (Exh. EE.) Petitioner did not petition the Arizona Supreme Court to review the Court of Appeals' decision.

On July 10, 2007, Petitioner filed a pro per notice of post-conviction relief, and the trial court appointed counsel.[3] (Exhs. II, JJ.) On May 1, 2008, Petitioner, through counsel, filed a PCR petition, raising two claims:

(1) Kiehle was denied counsel at a critical stage of trial when counsel declined the trial court's offer to present a supplemental closing argument in response to a jury question, and Kiehle was therefore entitled to relief without a showing of prejudice under United States v. Cronic, 466 U.S. 648 (1984); and

(2) The trial court erred by correcting the amount of presentence incarceration credit it had awarded Kiehle, because Kiehle's appeal was pending and the trial court lacked jurisdiction over the case.

(Exh. MM.) The State filed a response (Exh. NN), and Petitioner filed a reply. (Exh. OO.) On September 17, 2008, the trial court rejected both claims on their merits. (Exh. PP.)

Petitioner subsequently petitioned the Arizona Court of Appeals to review the trial court's decision. (Exh. QQ; Exh. RR.) The Court of Appeals denied review without comment on February 3, 2010 (Exh. SS), and Petitioner sought review in the Arizona Supreme Court. (Exh. TT.) The Supreme Court denied review on July 7, 2010. (Exh. UU.)

---

[3] On August 1, 2007, Petitioner filed a second pro per notice of post-conviction relief. (Exh. KK.) The trial court noted that Petitioner had already initiated a post-conviction relief proceeding, forwarded the notice to Petitioner's counsel, and announced it would accept no additional pro per pleadings or correspondence from Petitioner. (Exh. LL.)

Petitioner filed his second Amended Petition on April 4, 2011, raising two grounds for relief. (Doc. 7.) In Ground One, Petitioner alleges that he received "ineffective assistance of counsel," in violation of the "5th and 14th Amendment under the guarantee of due process," when counsel declined the trial court's offer to make an additional closing argument in response to a question from the jury.[4] In Ground Two, Petitioner contends that the trial court violated his right to due process under the Fifth and Fourteenth Amendments when, after sentencing and while Petitioner's direct appeal was pending in the Arizona Court of Appeals, it corrected the amount of presentence incarceration it had awarded Petitioner.

## DISCUSSION

With respect to Ground Two, Respondents contend that although Petitioner asserts a violation of his due process rights, Ground Two solely raises a state-law issue, which is not cognizable on federal habeas review. As to Ground One, Respondents argue that Petitioner's claim fails on the merits.

**A.     Ground Two**

In Ground Two of his habeas petition, Petitioner argues that the trial court erred by correcting the amount of presentence incarceration credit it had awarded him while his direct appeal was pending. (Doc. 7 at 7.) Specifically, he contends that the trial court could not "correct an illegally lenient sentence in the absence of an appeal or cross-appeal by the state." Notably, Petitioner does not attack the trial court's correction of his sentence as erroneous, but instead, challenges the procedure by which the court corrected his sentence, and questions whether the court possessed the authority to do so absent an appeal or cross-appeal from the State.

Whether the trial court followed the proper procedure to correct Petitioner's sentence under Arizona law, and whether it possessed the authority to make the correction, are state law questions that are not cognizable on habeas review. The Court can grant habeas relief "only on the ground that [a petitioner] is in custody in violation of the Constitution or laws

---

[4] Here, the Court construes Petitioner's claim as alleged in Ground One as a violation of his Sixth Amendment right to effective assistance of counsel.

or treaties of the United States." 28 U.S.C. § 2254(a). "[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." Estelle v. McGuire, 502 U.S. 62, 67-68 (1991); see Lewis v. Jeffers, 497 U.S. 764, 780 (1990) ("[F]ederal habeas corpus relief does not lie for errors of state law."). Additionally, a petitioner cannot "transform a state-law issue into a federal one merely by asserting a violation of due process." Langford v. Day, 110 F.3d 1380, 1389 (9th Cir. 1996), cert. denied, 522 U.S. 881 (1997); see Engle v. Isaac, 456 U.S. 107, 119-21 (1982) ("While they attempt to cast their first claim in constitutional terms, we believe that this claim does no more than suggest that the instructions at respondents' trials may have violated state law."). Accordingly, the Court will recommend that Petitioner's claim as asserted in Ground Two be denied.

**B.  Ground One**

In Ground One, Petitioner alleges that he received ineffective assistance of counsel when counsel declined the opportunity to make an additional closing argument in response to a question from the jury. (Doc. 7 at 6.)

Pursuant to the AEDPA[5], a federal court "shall not" grant habeas relief with respect to "any claim that was adjudicated on the merits in State court proceedings" unless the state court decision was (1) contrary to, or an unreasonable application of, clearly established federal law as determined by the United States Supreme Court; or (2) based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. See 28 U.S.C. § 2254(d); Williams v. Taylor, 529 U.S. 362, 412-13 (2000) (O'Connor, J., concurring and delivering the opinion of the Court as to the AEDPA standard of review). "When applying these standards, the federal court should review the 'last reasoned decision' by a state court ... ." Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004).

---

[5] Antiterrorism and Effective Death Penalty Act of 1996.

A state court's decision is "contrary to" clearly established precedent if (1) "the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases," or (2) "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [its] precedent." Taylor, 529 U.S. at 405-06. "A state court's decision can involve an 'unreasonable application' of Federal law if it either 1) correctly identifies the governing rule but then applies it to a new set of facts in a way that is objectively unreasonable, or 2) extends or fails to extend a clearly established legal principle to a new context in a way that is objectively unreasonable." Hernandez v. Small, 282 F.3d 1132, 1142 (9th Cir. 2002).

The two-prong test for establishing ineffective assistance of counsel was established by the Supreme Court in Strickland v. Washington, 466 U.S. 668 (1984). In order to prevail on an ineffective assistance claim, a convicted defendant must show (1) that counsel's representation fell below an objective standard of reasonableness, and (2) that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. See id. at 687-88.

Regarding the performance prong, a reviewing court engages a strong presumption that counsel rendered adequate assistance, and exercised reasonable professional judgment in making decisions. See id. at 690. "[A] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Bonin v. Calderon, 59 F.3d 815, 833 (9th Cir. 1995) (quoting Strickland, 466 U.S. at 689). Moreover, review of counsel's performance under Strickland is "extremely limited": "The test has nothing to do with what the best lawyers would have done. Nor is the test even what most good lawyers would have done. We ask only whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial." Coleman v. Calderon, 150 F.3d 1105, 1113 (9th Cir.), judgment rev'd on other grounds, 525 U.S. 141 (1998). Thus, a court "must judge the reasonableness of counsel's

challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." Strickland, 466 U.S. at 690.

If the prisoner is able to satisfy the performance prong, he must also establish prejudice. See id. at 691-92; see also Smith v. Robbins, 528 U.S. 259, 285 (2000) (burden is on defendant to show prejudice). To establish prejudice, a prisoner must demonstrate a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. A "reasonable probability" is "a probability sufficient to undermine confidence in the outcome." Id. A court need not determine whether counsel's performance was deficient before examining whether prejudice resulted from the alleged deficiencies. See Robbins, 528 U.S. at 286 n.14. "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." Id. (quoting Strickland, 466 U.S. at 697).

In reviewing a state court's resolution of an ineffective assistance of counsel claim, the Court considers whether the state court applied Strickland unreasonably:

> For [a petitioner] to succeed [on an ineffective assistance of counsel claim], ... he must do more than show that he would have satisfied Strickland's test if his claim were being analyzed in the first instance, because under § 2254(d)(1), it is not enough to convince a federal habeas court that, in its independent judgment, the state-court decision applied Strickland incorrectly. Rather, he must show that the [state court] applied Strickland to the facts of his case in an objectively unreasonable manner.

Bell v. Cone, 535 U.S. 685, 698-99 (2002) (citations omitted); see also Woodford v. Visciotti, 537 U.S. 19, 24-25 (2002) ("Under § 2254(d)'s 'unreasonable application' clause, a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the state-court decision applied Strickland incorrectly. Rather, it is the habeas applicant's burden to show that the state court applied Strickland to the facts of his case in an objectively unreasonable manner.") (citations omitted).

During deliberations, the jurors informed the trial court that they had arrived at an impasse, and asked to review letters Petitioner had written B. after Natalie's murder, which had been mentioned at trial but not admitted into evidence. (Exh. D.) After consulting with

the parties (Exh. V), the trial court instructed the jurors to continue deliberating and decide the case based on the evidence presented. (Exh. D.) The court also stated, "[i]f there is a specific issue with which you need assistance, please write it down. I will discuss your note with the lawyers. If, in the context of the evidence that has been presented, there is a way to assist you, we will attempt to do so." (Exh. D.)

Several hours later, the jurors sent another note, which stated: "We are at an impasse as to agreeing on a verdict and have exhausted discussion possibilities. Please advise on how we should proceed." (Exh. D.) The trial court assembled the parties in chambers, and proposed that it either (1) suggest that the jurors "sleep[] on it" and deliberate further in the morning, or (2) determine from the jurors "what issue they [were] hung up on," and allow supplemental argument on that topic. (Exh. W at 3-4.) Defense counsel informed the court he was concerned that the court's actions could coerce a verdict, and suggested that the jurors "just be told if they can't reach a verdict, we're declaring a mistrial." (Exh. W at 6-7.) Thereafter, the court addressed the jurors in open court, asked them to provide a list of "issues … where there is some disagreement," and announced that the court and parties would attempt to form "a plan to see if [they could] help [the jurors] address those issues." (Exh. W at 11-13.) The jurors then submitted a note setting forth the basis of their impasse:

> The impasse is not related to whether or not Natalie Kiehle committed suicide. We're all in agreement based on the evidence she did not. Our differences relate to whether David pulled the trigger. To assist us in resolving this difference we'd like to have the following information relative to B[.]'s interview in North Carolina. All the letters that David wrote to B[.] that were given to the Chandler Police Department by [Natalie's] family, we do not feel this request is … unreasonable given the fact that both items were mentioned in the discussion in open court and number two, would also like clarification regarding the fingerprint lifted off the murder weapon. Were they found not to be David Kiehle's or were they inc[onc]lusive to whether they were his.

(Exh. W at 13-14.)

After conferring with the parties, the trial court announced its intention to permit supplemental closing argument addressing the above issues. (Exh. W at 13-15.) Defense counsel asserted that the court had already improperly permitted the jurors to "include[] [the parties] in their deliberations," and opined that there was "nothing in the record [the parties]

- 11 -

could say" in response to the jurors' first question (regarding B.'s letters), because the requested evidence was not admitted, and that the jurors' second question (regarding the fingerprints) had been addressed by the testimony. (Exh. W at 15-16.) The court resolved to allow each party 20 minutes of supplemental argument the following morning. (Exh. W at 16-17.)

The next day, defense counsel filed a written motion for a mistrial, arguing that the trial court had improperly inquired into the jurors' "subjective thought processes," and thereby learned that it had "unanimously rejected the defense of suicide and that it want[ed] more evidence on the issue of who committed the homicide." (Exh. E.) Counsel further noted, *inter alia*, that the jurors had not requested additional argument, and that argument on the letters from Petitioner to B. would involve commenting on items not in evidence. (Exh. E.) Finally, counsel contended that any instruction charging the jurors to continue deliberating could coerce a verdict and violate a host of Petitioner's constitutional rights. (Exh. E.) The trial court denied the motion but, at counsel's request, cautioned the jurors that it was not "trying to force [them] to surrender [their] honest convictions in order to reach a verdict." (Exh. X at 3-5.) Defense counsel stated, "I am not going to address the jury, [I'm] just going to sit on the record as it is. I have no evidence to offer them." (Exh. X at 4.)

The prosecutor thereafter presented a supplemental closing argument, during which he observed the sheer lack of evidence to support the conclusion that B. killed Natalie. (Exh. X at 6-13.) Defense counsel objected to the prosecutor's comments on a number of occasions. (Exh. X at 6-13.) After the argument, defense counsel again moved for a mistrial based on the grounds that the prosecutor (1) improperly commented on Petitioner's failure to call B. as a witness, (2) commented on facts not in evidence, and (3) engaged in vouching. (Exh. X at 13-14.) He also reargued his claim that the court's actions were coercive. (Exh. X at 14-15.) The court denied the motion. (Exh. X at 15.)

In his PCR petition, Petitioner argued that counsel was ineffective under the Sixth and Fourteenth Amendments for declining the trial court's offer to permit supplemental closing argument. (Exh. MM at 3-12; Exh. OO at 2-5.) Petitioner further argued that counsel's

decision resulted in the complete denial of counsel at a critical stage of trial, entitling Petitioner to a presumption of prejudice under Cronic. (Exh. MM at 3-12; Exh. OO at 2-5.) Alternatively, Petitioner argued that counsel's alleged error was prejudicial under Strickland because the prosecutor made a supplemental argument, and the jury returned a verdict shortly thereafter. (Exh. MM at 3-12; Exh. OO at 2-5.)

In the last reasoned state court decision, the PCR court rejected the claim on the merits stating, in pertinent part:

Pending before the Court is Defendant's Petition for Post-Conviction Relief. The Court has considered the petition, the State's response and Defendant's reply. The Court notes that this Court was the trial judge and that the Court has a good recollection of the trial.

The Court is of the opinion that … *Cronic* … is inapplicable to this case. Defendant was represented by counsel at all critical stages of the trial. Defendant's attorney was never absent and was never prevented from assisting Defendant at any stage of the trial. Defendant's counsel subjected the State's case to vigorous adversarial testing throughout the trial. Defendant's counsel['s] conduct of the trial exceeded the standard of practice for defense attorneys. For those reasons, *Cronic* does not apply.

The Court is of the opinion, having considered the context in which [counsel] chose not to give supplemental argument, that the decision was one of trial tactics. It was quite apparent to this Court that [counsel] did not agree with the Court's decision to order supplemental oral argument. He filed a motion for mistrial based on that decision. It was patently obvious that as part of Defendant's trial tactics, [counsel] chose not to participate in the supplemental argument because he did not wish to waive on appeal what he considered to be this Court's error. The tactic was not unreasonable given the circumstances of the case at the time because, as noted below, the jury had ruled out suicide and Defendant needed some issue to preserve in hopes of obtaining a third new trial.

Having observed [counsel's] performance during the entire trial, this Court is of the opinion that no one could deem the representation deficient. Nor is there any evidence that the waiver of supplemental argument was prejudicial. It is apparent from the jury's note that it had concluded that the death was not a suicide. The thrust of the defense was that Mrs. Kiehle had committed suicide. The jury having ruled out suicide, there were only two possible shooters – Defendant and the victim's twelve-year-old daughter. The evidence clearly showed that the young girl was not the shooter. The evidence clearly supported the jury's verdict that Defendant was the shooter.

(Exh. PP.)

Petitioner argues that counsel's failure to present supplemental argument constituted "a denial of his right to counsel at a critical sta[g]e of his trial." (Doc. 7 at 6.) To the extent

- 13 -

Petitioner contends, as he did in his PCR petition (Exh. MM), that <u>Cronic</u>, instead of <u>Strickland</u>, governs his claim, the Court finds that the PCR court reasonably rejected this argument.

"*Cronic* recognized a narrow exception to *Strickland*'s holding that a defendant who asserts ineffective assistance of counsel must demonstrate not only that his attorney's performance was deficient, but also that the deficiency prejudiced the defense." <u>Florida v. Nixon</u>, 543 U.S. 175, 190 (2004). In <u>Cronic</u>, the Supreme Court "instructed that a presumption of prejudice would be in order in 'circumstances that are so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified.'" <u>Id.</u> (quoting <u>Cronic</u>, 466 U.S. at 658). The Court identified three categories of error under which prejudice from counsel's ineffectiveness may be presumed: (1) "if the accused is denied counsel at a critical stage of his trial"; (2) "if counsel entirely fails to subject the prosecution's case to meaningful adversarial testing"; and (3) where "the surrounding circumstances made it so unlikely that any lawyer could provide effective assistance." <u>Cronic</u>, 466 U.S. at 658-61. Errors warranting <u>Cronic</u>'s presumption occur "infrequently." <u>Nixon</u>, 543 U.S. at 190.

The United States Supreme Court has not extended <u>Cronic</u>'s first category (denial of counsel at a critical stage) to the specific factual circumstance presented here – the decision to forego supplemental closing argument in response to a jury's question. And, the Supreme Court has specifically determined that a claim of ineffectiveness for waiving closing argument does not fit within <u>Cronic</u>'s second category (failure to subject the prosecution's case to meaningful adversarial testing) either, and must be analyzed under <u>Strickland</u>. <u>See</u> <u>Bell</u>, 535 U.S. at 697-98 ("The aspects of counsel's performance challenged by respondent [including the waiver of closing argument] are plainly of the same ilk as other specific attorney errors we have held subject to *Strickland*'s performance and prejudice components."). Thus, the PCR court's decision that <u>Cronic</u> was inapplicable was not an unreasonable application of clearly established Federal law. <u>See</u> <u>Wright v. Van Patten</u>, 552 U.S. 120, 125-26 (2008) (state court decision refusing to presume prejudice under <u>Cronic</u>

from counsel's participation in hearing by speaker phone did not warrant habeas relief "[b]ecause our cases give no clear answer to the question presented, let alone one in [the prisoner's] favor," and the court therefore could not conclude "that the state court unreasonabl[y] applie[d] clearly established Federal law") (quotations omitted).

Regarding the deficient performance prong, the Court finds that the PCR court reasonably concluded that counsel's decision not to present supplemental closing argument was tactical. The PCR court's ruling – issued by the same judge who had presided over Petitioner's trial – was based in large part on the judge's firsthand observations of counsel during the parties' dialogue about the jurors' concerns and the possibility of supplemental closing argument. (Exh. PP – finding that it "was quite apparent" that counsel disagreed with the court's ruling, and it was "patently obvious" that counsel's decision not to participate was a trial tactic.)

As the PCR court observed, counsel considered the court's decision to permit additional argument erroneous and potentially coercive, and it was reasonable for him to refuse to participate in the exercise in order to avoid waiving his objection or compounding the perceived error. (Exh. PP.) Moreover, the jury had ruled out Petitioner's theory of defense – that Natalie committed suicide – and was considering the possibility that B., not Petitioner, killed Natalie. Counsel was, therefore, faced with three apparent choices: (1) abandoning his theory that Natalie committed suicide and encouraging the jurors, for the first time, to acquit Petitioner because B. was the true killer (a theory that lacked evidentiary support, would have potentially diminished counsel's credibility with the jurors, and would have required counsel to implicate his client's daughter in a murder); (2) attempting to convince the jury to reconsider its decision that Natalie did not committed suicide; or (3) foregoing argument altogether.

In light of these choices, counsel's decision to waive argument was not unreasonable. See Yarborough v. Gentry, 540 U.S. 1, 5-6 (2003) ("[C]ounsel has wide latitude in deciding how best to represent a client, and deference to counsel's tactical decisions in his closing presentation is particularly important because of the broad range of legitimate defense

strategy at that stage …. Indeed, it might sometimes make sense to forego closing argument altogether."); see also Bell, 535 U.S. at 701-02 ("Neither option [available to counsel] … so clearly outweighs the other that it was objectively unreasonable for the [state court] to deem counsel's choice to waive argument a tactical decision about which competent lawyers might disagree."). The PCR court's decision was neither contrary to, nor an unreasonable application of, Strickland, and did not involve an unreasonable factual determination.

Accordingly, the Court finds that the state court did not unreasonably apply Strickland in rejecting Petitioner's claim for ineffective assistance of counsel. The court reasonably determined that (1) Petitioner was not denied counsel at a critical stage of the trial, and Cronic was inapplicable, and (2) counsel's decision not to present supplemental argument was a tactical one that did not constitute deficient performance. The Court will recommend that Petitioner's claim as alleged in Ground One be denied.

## CONCLUSION

Having determined that Ground Two fails to constitute a basis for federal habeas relief and that Ground One fails on the merits, the Court will recommend that Petitioner's amended Petition for Writ of Habeas Corpus be denied and dismissed with prejudice.

**IT IS THEREFORE RECOMMENDED** that Petitioner's amended Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 (Doc. 7) be **DENIED** and **DISMISSED WITH PREJUDICE**;

**IT IS FURTHER RECOMMENDED** that a Certificate of Appealability and leave to proceed *in forma pauperis* on appeal be **DENIED** because Petitioner has not made a substantial showing of the denial of a constitutional right.

This recommendation is not an order that is immediately appealable to the Ninth Circuit Court of Appeals. Any notice of appeal pursuant to Rule 4(a)(1), Federal Rules of Appellate Procedure, should not be filed until entry of the district court's judgment. The parties shall have fourteen days from the date of service of a copy of this recommendation within which to file specific written objections with the Court. See 28 U.S.C. § 636(b)(1); Rules 72, 6(a), 6(b), Federal Rules of Civil Procedure. Thereafter, the parties have fourteen

days within which to file a response to the objections. Failure timely to file objections to the Magistrate Judge's Report and Recommendation may result in the acceptance of the Report and Recommendation by the district court without further review. See United States v. Reyna-Tapia, 328 F.3d 1114, 1121 (9th Cir. 2003). Failure timely to file objections to any factual determinations of the Magistrate Judge will be considered a waiver of a party's right to appellate review of the findings of fact in an order or judgment entered pursuant to the Magistrate Judge's recommendation. See Rule 72, Federal Rules of Civil Procedure.

DATED this 3rd day of February, 2012.

Michelle H. Burns
United States Magistrate Judge